Ernest McDONALD, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 16304.

United States Court of Appeals
District of Columbia Circuit.

Reargued *En Banc* May 8, 1962.

Decided Oct. 8, 1962.

Wilbur K. Miller, Chief Judge, dissented in part.

See also 109 U.S.App.D.C. 98, 284 F. 2d 232.

848

Mr. Harry L. Ryan, Jr., Washington, D. C. (appointed by this court), for appellant.

Mr. Nathan J. Paulson, Asst. U. S. Atty. at the time of argument, for appellee. Messrs. David C. Acheson, U. S. Atty., Charles T. Duncan, Principal Asst. U. S. Atty., and Arthur J. McLaughlin and Judah Best, Asst. U. S. Attys., were on the brief for appellee. Mr. Daniel J. McTague, Asst. U. S. Atty., also entered an appearance for appellee.

Mr. Abe Krash and Miss Selma Levine, Washington, D. C., filed a brief on behalf of the American Orthopsychiatric Ass'n, as *amicus curiae*.

Mr. Warren E. Magee, Washington, D. C., filed a brief on behalf of the American Psychiatric Ass'n, as *amicus curiae*.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER and WRIGHT, Circuit Judges, sitting *en banc*.

PER CURIAM.

Appellant was convicted of manslaughter and sentenced to from five to fifteen years' imprisonment. He had been charged with second degree murder for aiding and abetting his employer, Davis, in the shooting of one Jenkins during an altercation. The District Court allowed this appeal *in forma pauperis* and we appointed new counsel. After the case was heard by a division of this court, a rehearing *en banc* was ordered *sua sponte*.

In this appeal appellant urges that the court's charge to the jury was fatally defective in two respects. First, the court failed to state that, if acquitted by reason of insanity, appellant would be confined in a mental hospital until it was determined that he was no longer dangerous to himself or others. D.C.Code § 24–301(d). This statement is required unless it "appears affirmatively on the record" that the defendant did not want it. Lyles v. United States, 103 U.S.App. D.C. 22, 25, 254 F.2d 725, 728, certiorari denied, 356 U.S. 961, 78 S.Ct. 997, 2 L. Ed.2d 1067.

Second, in its charge the court twice enumerated the alternative verdicts available to the jury. But both times it failed

to include "not guilty because of insanity." Thus, before charging on the issue of insanity, the court instructed the jury to return one of the following five possible verdicts: (1) guilty of second degree murder, (2) guilty of manslaughter, (3) guilty of assault with a dangerous weapon, (4) guilty of assault, or (5) not guilty. (Tr. 275.) Later the court did charge the jury on criminal responsibility, concluding: "If you * * * are not satisfied beyond a reasonable doubt that the act was not a product of a mental defect, then your verdict must be not guilty because of insanity." (Tr. 288.)

After the charge was concluded, the court called a bench conference at which defense counsel expressed substantial [1] satisfaction with the instructions, making no reference to or request concerning the so-called *Lyles* instruction on mandatory commitment of persons found not guilty by reason of insanity. Thereupon the court told the jury:

"I am going to repeat something that I said to you earlier and that is that you may return any one of five possible verdicts in this case. Your verdict may be either guilty of second degree murder or guilty of manslaughter or guilty of assault with a dangerous weapon or guilty of assault or not guilty." (Tr. 290.)

The Government urges us to find from defense counsel's failure to object to the court's charge that it "appears affirmatively" that appellant did not want the *Lyles* instruction on hospital confinement, and that the omission of an insanity verdict from the court's lists of alternatives must be deemed harmless because of reference to it elsewhere. The Government also urges that the evidence was insufficient to require an instruction on responsibility, hence any defects in the instruction are immaterial. We do not agree that the instruction was unnecessary.

### I.

■■ Under Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, if there is "some evidence" supporting the defendant's claim of mental disability, he is entitled to have that issue submitted to the jury. Under Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, evidence of a "mental disease" or "mental defect" raises the issue. The subject matter being what it is, there can be no sharp quantitative or qualitative definition of "some evidence." Certainly it means more than a scintilla,[2] yet, of course, the amount need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal.[3] The judgment of the trial judge as to the sufficiency of the evidence is entitled to great weight on appeal, but, since the defendant's burden is merely to raise the issue, any real doubt should be resolved in his favor.[4]

In this case a psychiatrist and a psychologist testified that the defendant had a "mental defect," principally because his I.Q. rating shown by various tests was below the "average" intelligence range of 90 to 110. His overall I.Q. was 68. Neither witness was able to say whether ap-

1. Defense counsel requested a further charge upon a matter not relevant here. The court denied the request.

2. Battle v. United States, 209 U.S. 36, 38.

3. Compare Tatum v. United States, 88 U.S. App.D.C. 386, 190 F.2d 612; Durham v. United States, 94 U.S.App.D.C. 228, 232, 214 F.2d 862, 866; Wright v. United States, 102 U.S.App.D.C. 36, 39, 250 F. 2d 4, 7; Logan v. United States, 109 U. S.App.D.C. 104, 284 F.2d 238; Fitts v. United States, 10 Cir., 284 F.2d 108; United States v. Currens, 3 Cir., 290 F.2d 751, 761; Hall v. United States, 4 Cir., 295 F.2d 26.

4. In considering the quantum of evidence necessary to raise the issue of criminal responsibility, we cannot ignore our experience that in most cases the accused does not possess the knowledge and financial ability required to seek and obtain expert testimony in his behalf. Ordinarily such persons can only obtain examinations by psychiatrists employed in government institutions, and if these examinations are inadequate, "the [resulting] inadequacy of the evidence is not a point in favor of the prosecution." Williams v. United States, 102 U.S.App.D.C. 51, 55–56, 250 F.2d 19, 23–24.

pellant's mental defect stemmed from organic injury or from some other cause. But the psychiatrist testified that some organic pathology can only be established by autopsy and that McDonald's defect probably prevented him from progressing beyond the sixth grade.

The witnesses also explained generally how mental defect affects behavior. The psychologist testified that a person suffering from a mental defect would have less ability than normal persons to distinguish between right and wrong in complex situations (Tr. 233); would tend to act impulsively under stress (*ibid.*); and would readily become dependent upon and be strongly influenced by someone who befriended him (Tr. 234–235). The witness testified further that McDonald had a mental defect, which she defined as "a state of mental development which does not reach the level of average intelligence," (Tr. 245) and that "if McDonald had a person on whom he was dependent * * * and if that person should produce a gun and threaten another * * * McDonald [would not] be as able as the average adult to assess and evaluate the situation and the consequences of whatever action he might take * * *" (Tr. 235).[5] The psychiatrist stated that McDonald would lack the ability of normal persons to foresee the consequences of his acts and offered an opinion that appellant's relationship to Davis was to some extent a product of his mental deficiency.

▆▆▆ Evidence of a 68 I.Q. rating, standing alone and without more, is not evidence of a "mental defect," thus invoking the *Durham* charge. Where, as here, other evidence of mental abnormality appears, in addition to the I.Q. rating, the *Davis* case would control and the instruction should be given. The introduction of competent evidence of mental disorder raises the issue of causality sufficient for jury consideration. See Durham v. Unit-

ed States, 94 U.S.App.D.C. 228, 241, n. 49, 214 F.2d 862, 875, n. 49; Blocker v. United States, 107 U.S.App.D.C. 63, 274 F.2d 572; Goforth v. United States, 106 U.S. App.D.C. 111, 269 F.2d 778; United States v. Amburgey, D.D.C., 189 F.Supp. 687. Cf. Tatum v. United States, 88 U.S. App.D.C. 386, 190 F.2d 612.

▆▆▆ It does not follow, however, that whenever there is any testimony which may be said to constitute "some evidence" of mental disorder, the Government must present affirmative rebuttal evidence or suffer a directed verdict. A directed verdict requires not merely "some evidence," but proof sufficient to compel a reasonable juror to entertain a reasonable doubt concerning the accused's responsibility.[6] Durham v. United States, 94 U.S.App.D.C. at 232, n. 8, 214 F.2d at 866, n. 8; Hall v. United States, 4 Cir., 295 F.2d 26. See 9 Wigmore, Evidence, § 2487; Abbott, Two Burdens of Proof, 6 Harv.L.Rev. 125. Whether uncontradicted evidence, including expert opinion evidence, which is sufficient to raise a jury question on the mental issue is also sufficient to require a directed verdict depends upon its weight and credibility. Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, clearly supports this position. There the Supreme Court said that the jury, in considering an insanity plea, must weigh all the evidence, including the presumption of sanity. 160 U.S. at 488, 16 S.Ct. at 358. Whether uncontradicted expert testimony overcomes the presumption depends upon its weight and credibility, and weight and credibility ordinarily are for the jury. See Stewart v. United States, 94 U.S.App.D. C. 293, 295, 214 F.2d 879, 882.

## II.

▆▆▆ Our eight-year experience under *Durham* suggests a *judicial* defini-

---

5. McDonald's testimony suggests that he was financially and socially dependent upon Davis. (See Tr. 161–163.)

6. Wright v. United States, 102 U.S.App.D. C. 36, 250 F.2d 4; Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52; Satterwhite v. United States, 105 U.S.App. D.C. 398, 267 F.2d 675; Hopkins v. United States, 107 U.S.App.D.C. 126, 275 F.2d 155; Campbell v. United States, 113 U.S.App.D.C. 260, 307 F.2d 597.

tion, however broad and general, of what is included in the terms "disease" and "defect." In *Durham,* rather than define either term, we simply sought to distinguish disease from defect. Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. What psychiatrists may consider a "mental disease or defect" for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. Consequently, for that purpose the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. Thus the jury would consider testimony concerning the development, adaptation and functioning of these processes and controls.

We emphasize that, since the question of whether the defendant has a disease or defect is ultimately for the triers of fact, obviously its resolution cannot be controlled by expert opinion.[7] The jury must determine for itself, from all the testimony, lay and expert, whether the nature and degree of the disability are sufficient to establish a mental disease or defect as we have now defined those terms. What we have said, however, should in no way be construed to limit the latitude of expert testimony.[8] Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617.

### III.

■ Having determined in Part I hereof that the charge on criminal responsibility was required, we revert now to a consideration of the other contentions made by the parties with respect to that charge as given. The able and experienced trial court, in the course of the charge, failed to give the *Lyles* instruction concerning the disposition of a defendant acquitted by reason of insanity, and we are unable, from our study of the record, to say that this defendant affirmatively waived it. Lyles v. United States, supra, 103 U.S.App.D.C. at 25–26, 254 F.2d at 728–729. Since the case will have to be retried, it may be well simply to note two other inadvertences in the court's charge which we are confident will not recur on retrial.

As heretofore indicated, following a bench conference after the judge had concluded his charge, an additional instruction was given the jury, outlining the alternative possible verdicts, without including not guilty by reason of insanity. Also, in its concluding remarks relating to mental responsibility of the accused, the court charged as follows:

"If you find that this defendant committed this offense, that is, murder in the second degree or the lesser included offenses and you further find that at the time he committed this offense he was suffering from a mental disease or defect which affected him, that he was incapable of distinguishing right from wrong or if he could tell right from wrong was incapable of controlling his actions, then you would find that the defendant's act was the product of the defendant's mental abnormality." (Tr. 283.)

■ This is not an accurate statement of the *test* for criminal responsibility in this Circuit. We think the jury may be instructed, provided there is testimony on the point, that capacity, or lack thereof, to distinguish right from wrong and ability to refrain from doing a wrong or unlawful act[9] may be considered in determining whether there is

---

7. See, however, Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168, where the evidence required the direction of a judgment of acquittal by reason of insanity.

8. See Note 9, infra.

9. An expert may not be compelled to testify in these terms if he believes they are essentially moral or legal considerations beyond the scope of his special competence as a behavioral scientist. Stewart v. United States, 101 U.S.App.D.C. 51, 53, 247 F.2d 42, 44.

a relationship between the mental disease and the act charged. It should be remembered, however, that these considerations are not to be regarded in themselves as independently controlling or alternative tests of mental responsibility in this Circuit. They are factors which a jury may take into account in deciding whether the act charged was a product of mental disease or mental defect. Wright v. United States, supra, 102 U.S. App.D.C. at 44, 250 F.2d at 12; Misenheimer v. United States, 106 U.S.App.D. C. 220, 271 F.2d 486, certiorari denied, 361 U.S. 971, 80 S.Ct. 603, 4 L.Ed.2d 550.

Reversed and remanded.

DANAHER, Circuit Judge (concurring).

I concur in Parts I, II and III of the court's opinion.

As to the *Lyles* point with respect to hospital confinement following a verdict of not guilty by reason of insanity, I have not changed my view.

Here the defense did not request such an instruction although various other requests were submitted. Rule 30 provides that no omission from the charge shall be assigned as error by the appellant unless before the jury retires, objection be made "stating distinctly the matter to which he objects and the grounds of his objection."

The judge specifically asked trial counsel if he had "any other objection to the charge, as given." He replied, "No other objection to the charge."

Of course the instruction, if requested, would have been given. Cf. Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). But in view of the trial strategy, the accused may not have wanted an instruction on the *Lyles* question. We now seem to say that the defense could sit back, wait to see what verdict the jury might reach, and thereafter secure reversal here because it does not "affirmatively" appear that the *Lyles* instruction was waived. *Lyles* thus becomes a legal trap for the trial judge who relied upon the position voiced by counsel.

I do not subscribe to that view.

BASTIAN, Circuit Judge (concurring). I concur, except that I adhere to the view stated in my opinion in Lyles v. United States, 103 U.S.App.D.C. 22, at 29, 254 F.2d 725, at 732 (1957), cert. denied, 356 U.S. 1961, 78 S.Ct. 997, 2 L. Ed.2d 1067 (1958), that the trial court should not be obliged to give, in its charge, a statement as to the effect of a verdict of not guilty by reason of insanity.

I believe Parts I and II of the majority opinion are correct and will do much to relieve the natural uncertainty in the minds of the District Court as to the insanity question.

WILBUR K. MILLER, Chief Judge (dissenting in part and concurring in part).

Distilled to its essence, the majority opinion reverses McDonald's conviction because the trial judge did not tell the jury the "meaning" [1] of a verdict of not guilty by reason of insanity, as apparently required by Lyles v. United States.[2] That is the only decisional conclusion reached by the majority, as clearly appears from the following excerpt from the latter portion of their opinion:

"  *    *    *   The able and experienced trial court, in the course of the charge, failed to give the *Lyles* instruction concerning the disposition of a defendant acquitted by reason of insanity, and we are unable, from our study of the record, to say that this defendant affirmatively waived it. Lyles v. United States, supra, 103 U.S.App.D.C. [22] at 25–26, 254 F.2d [725] at 728–729. Since the case will have to be retried, it may be well simply to note two other inadvertences in the court's charge which we are confident will not recur on retrial."

---

1. That is, the consequences.

2. 103 U.S.App.D.C. 22, 254 F.2d 725 (1957).

Thus, the majority are saying that the case will have to be retried because the *Lyles* instruction was not given, *i.e.*, that the judgment is being reversed for that reason. Having so ruled, they say "it may be well *simply to note* two other inadvertences in the court's charge * * *." (Emphasis added.) The majority do not base reversal on either of those "two other inadvertences," nor could they reasonably have done so, as I shall show later in this dissent.

I dissent from the reversal of McDonald's conviction on the ground that the *Lyles* instruction was not given because I am convinced that the majority opinion in the *Lyles* case is in that respect not an authoritative holding of this court and therefore is not binding on us in this or any other case; and that, if it is a binding precedent, it should be overruled as an incorrect statement of the law. I think, moreover, that if the *Lyles* requirement of the "meaning" instruction is considered authoritative, and if it is not overruled, nevertheless McDonald's conviction should not be reversed for the failure to give it, because it appears affirmatively on the record that McDonald did not want the instruction. In that event, the *Lyles* opinion says it is not reversible error to omit the "meaning" instruction.

*First, as to my suggestion that the Lyles requirement of the "meaning" instruction is obiter dictum.* There the majority correctly but unnecessarily say a verdict of not guilty by reason of insanity "means that the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others." Then this language follows, 103 U.S.App.D.C. at 25–26, 254 F.2d at 728–729:

> "Sometimes a defendant may not want such an instruction given. If that appears affirmatively on the record we would not regard failure to give it as grounds for reversal. Otherwise, whenever hereafter the

defense of insanity is fairly raised, the trial judge shall instruct the jury as to the legal meaning of a verdict of not guilty by reason of insanity in accordance with the view expressed in this opinion."

The implication is clear that a failure to instruct on the "meaning" of such a verdict would be regarded as reversible error, unless the accused had indicated he did not want the instruction.

I suggest that Point I of the *Lyles* majority opinion, which includes the language just quoted, is not an authoritative holding of this court, but is a gratuitous essay on the subject with which it deals. It decides a question which was not presented by the facts of the *Lyles* case, and was not suggested or discussed by the parties. Demonstrably, it is *obiter dictum* which the court is not required to follow in this or any case.

An analysis of the introductory paragraphs of the *Lyles* opinion and its text under Point I will show the foregoing to be true. The *Lyles* majority said in an early paragraph, 103 U.S.App.D.C., at 24–25, 254 F.2d at 727–728:

> "Our present consideration is addressed to several issues which can be stated as follows:

> "1. In cases where the defense of insanity is asserted what, if anything, should the court instruct the jury about the consequences of a verdict of not guilty by reason of insanity, pursuant to D.C.Code § 24–301?"

> (Three other "issues" are stated, with which we are not concerned.)

Thus, they were careful not to say this "issue" was presented by the parties or inherent in the record. Consciously, then, they stated an abstract question and proceeded to give an advisory and directory opinion about it. This is not, I think, a function of an appellate court. The *Lyles* majority announced, in effect, that failure to give the "meaning" instruction is reversible error; but they said it in a case in which the instruction

*had been given* in language which they said was satisfactory!

This is apparent from the text of the *Lyles* majority opinion under Point I which discusses the "issue" quoted above. The discussion begins thus, 103 U.S.App. D.C., at 25, 254 F.2d at 728:

> "The judge told the jury:
>
> "'If a defendant is found not guilty on the ground of insanity, it then becomes the duty of the Court to commit him to St. Elizabeths Hospital, and this the Court would do. The defendant then would remain at St. Elizabeths Hospital until he is cured and it is deemed safe to release him; and when the time arrives he will be released and will suffer no further consequences from this offense.'"

Nobody criticized or attacked the foregoing statement in the court's charge and, as I have pointed out, the *Lyles* majority said it was satisfactory. Giving the instruction just quoted was not, therefore, one of the "Plain errors or defects affecting substantial rights" which Rule 52(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. says "may be noticed although they were not brought to the attention of the court." Regardless of that, they said, after quoting from the charge:

> "This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. *But we think that doctrine does not apply in the problem before us.* * * *"
> (Emphasis supplied.)

But, as shown above, there was no problem before the court of the sort which the *Lyles* majority stated and discussed under Point I, except a so-called "issue" which they themselves posed as a problem, but which was not in the case. I repeat that neither party had said the judge's charge in this respect was improper, inadequate or incomplete, and

point out again that the *Lyles* majority found it satisfactory. In those circumstances, it seems plain that the whole discussion under Point I is *obiter dictum* which should not be treated as an **authoritative holding.**

It was not until Point II was reached that the *Lyles* majority began to discuss an issue which was actually presented. The discussion begins thus, id. at 26, 254 F.2d at 729:

> "Having made to the jury the statement above quoted and discussed, the trial judge immediately said:
>
> "'I think I should add that Dr. Cushard of St. Elizabeths Hospital testified, as you will recall, that on a prior occasion he found no mental disorder whatever in the defendant, and that the defendant was a man of average intelligence.'
>
> Dr. Cushard had so testified. The question is whether the trial judge erred in making the quoted remark at the time and in the context in which he made it. * * *"

This was the portion of the judge's charge that was actually attacked by the appellant. He called it a "gratuitous digression" which "conveyed to the jury that the Appellant would be promptly released due to the fact that Doctor Cushard testified that Lyles was 'without mental disorder during his residence at St. Elizabeths Hospital.'" This, said Lyles, "effectively undermined the defense of insanity."

With respect to this, the Government's brief said:

> "Appellant argues still further, not that the trial court failed to instruct in accordance with applicable legal principles, but only that the summarization vitiated by innuendo the otherwise admittedly correct instructions. * * *"

Curiously enough, the *Lyles* majority refused to reverse on Point II. I discuss this Point only to emphasize the fact that Point I was not mentioned in either

brief, and that only the attack on the instructions, discussed in the *Lyles* case in Point II, was presented to the court.

*Second, as to my suggestion that the Lyles requirement of the "meaning" instruction is incorrect as a matter of law and should be overruled.* As I have said, in the present case the majority depend entirely upon the gratuitous *dictum* of Point I of the *Lyles* opinion as requiring reversal. Of course they can, if they choose, adopt the pronouncements of Point I and authoritatively announce here that a failure to give the instruction there prescribed was reversible error, for this is a case in which *the instruction was not given* and, according to the majority, was not affirmatively waived. But they have not made such an original announcement; apparently they have considered themselves bound by the *Lyles dictum*, and have followed it without adopting it as their own holding. I think it should not be adopted here because, in my view, it is not a correct statement of the law. A verdict of not guilty by reason of insanity is covered by what the *Lyles* majority admitted is "the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or in the nature or extent of it, or in probation."

If the *Lyles* majority's Point I discussion be regarded as an actual holding instead of a mere statement by the way, for the same reasons I think it should be overruled. In elaboration of those reasons, I reproduce here a portion of Judge Bastian's dissent from Point I of the *Lyles* opinion, in which Judge Danaher and I joined, *id.* at 29–30, 254 F.2d at 732–733:

"It seems to me unwise and unnecessary that a jury be told the result of their verdict of 'not guilty by reason of insanity.' In Federal courts, as at common law, the jury are not told the quantum of punishment which may be meted out if they convict, or that probation may be granted. For instance, they are not told that if a defendant is found guilty of manslaughter he may be punished by a fine not exceeding $1,000 or imprisonment not exceeding 15 years, or both. This is salutary, since their only function is to determine from the evidence the factual issue of guilt or innocence, and in reaching a verdict they should not be swayed by an extra-evidentiary consideration such as whether they approve of the possibility of probation or of the penalty which may be imposed by the trial judge. The jury will probably know, as Judges Prettyman and Burger suggest, that a verdict of guilty will result in the imposition of punishment unless probation is granted, but they will not know what the punishment may be and, therefore, will not be influenced to acquit if they consider the possible penalty too severe.

"The issue of insanity, fairly raised, does no more than present another factual question to the jury: whether the defendant was mentally responsible when the criminal act was done. That issue also should be determined on the basis of the evidence only and, in deciding it, the jury should not be influenced by a consideration of the result of an acquittal by reason of insanity; that is an extraneous consideration wholly unconnected with the evidence from which the jury must reach a determination of the factual issue raised concerning the defendant's mental condition.

"In short, the jury should be told nothing as to how the defendant will be dealt with in case of acquittal by reason of insanity. * * * *"

A strong statement which takes the same position was made by the Fifth Circuit in Pope v. United States, 298 F. 2d 507 (1962), where the court had an identical question before it. The only error specified by Pope was the refusal of the trial court to grant his request for the following instruction to the jury,

which he lifted from the *Lyles* opinion, 298 F.2d at 508:

"If a defendant is found not guilty on the ground of insanity, it then becomes the duty of the Court to commit him to St. Elizabeths Hospital, and this the Court would do. The defendant then would remain at St. Elizabeths Hospital until he is cured and it is deemed safe to release him; and when that time arrives he will be released and will suffer no further consequences from this offense."

The court said:

"We have concluded that the court properly refused the charge. It is not a correct statement of the law. * * *

"The primary question raised here relates in large measure to the province of the court and the duty and function of a jury in a criminal case where the statute imposes the duty upon the court to determine the sentence to be given. Generally speaking, jurors decide the facts in accordance with the rules of law as stated in the instructions of the court. Unless otherwise provided by statute, it is the duty of the court to impose sentence, or make such other disposition of the case as required by law, after the facts have been decided by the jury. To inform the jury that the court may impose minimum or maximum sentence, will or will not grant probation, when a defendant will be eligible for a parole, or other matters relating to the disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided. * * *"

Pope cited and relied upon the *Lyles* case, but the Fifth Circuit merely said, "Different rules and different statutes apply to the Courts in the District of Columbia * * *." This was a polite way of rejecting the *Lyles* case as unsound. The statutes are not substantially different, and the rules are different only because a majority of this court announced by way of *dictum* a rule which the Fifth Circuit thought incorrect. For the reasons given in Judge Bastian's *Lyles* dissent and in the *Pope* case, I vigorously protest against the adoption of the *Lyles* Point I *dictum* as the law of this circuit.

*Third, as to my suggestion that the Lyles instruction was waived.* Even if the *Lyles* Point I is adopted by the present majority as the law of this circuit, or if it is held by them to be an authoritative pronouncement instead of *obiter dictum*, I strongly urge that, nevertheless, they err in reversing McDonald's conviction because the *Lyles* instruction was not given; for I think it "appears affirmatively on the record" that he did not want such an instruction given.

With respect to this, the majority merely say, ". . . [W]e are unable, from our study of the record, to say that this defendant affirmatively waived" the *Lyles* instruction. Their only discussion of the record in this regard is the following:

"After the charge was concluded, the court called a bench conference at which defense counsel expressed substantial satisfaction with the instructions, making no reference to or request concerning the so-called *Lyles* instruction on mandatory commitment of persons found not guilty by reason of insanity. * * *"

I think this is quite enough to justify the conclusion that defense counsel, who undoubtedly was familiar with the *Lyles* decision, deliberately decided he did not want the instruction given. The import of the majority's language is that the instruction is not "affirmatively waived" unless the trial judge says in effect, "I am required to give the *Lyles* instruction unless you do not want it," and defense counsel answers, "We do not want it given." This is, I think, a far too stringent restriction of the principle of waiv-

er. My view is that, by his approval of the charge without the *Lyles* instruction, and his failure to request that it be given, McDonald's counsel effectively and affirmatively indicated he did not want it given. In passing, I suggest that it is unusual—to use a mild adjective—to permit a defendant to tell the trial judge whether or not to give an instruction said by the *Lyles* majority to be so necessary that its omission will require reversal.

In addition to the omission of the *Lyles* instruction which he assigned as error, McDonald argues the court's charge to the jury was fatally defective in a second respect which the majority describes as follows:

> "* * * [I]n its charge the court twice enumerated the alternative verdicts available to the jury. But both times it failed to include 'not guilty because of insanity.' Thus, before charging on the issue of insanity, the court instructed the jury to return one of the following five possible verdicts: (1) guilty of second degree murder, (2) guilty of manslaughter, (3) guilty of assault with a dangerous weapon, (4) guilty of assault, or (5) not guilty. Later the court did charge the jury on criminal responsibility, concluding: 'If you * * * are not satisfied beyond a reasonable doubt that the act was not a product of a mental defect, then your verdict must be not guilty because of insanity.'

> "After the charge was concluded, the court called a bench conference at which defense counsel expressed substantial satisfaction with the instructions * * *. Thereupon the court told the jury:

> " 'I am going to repeat something that I said to you earlier and that is that you may return any one of five possible verdicts in this case. Your verdict may be either guilty of second degree murder or guilty of man-

slaughter or guilty of assault with a dangerous weapon or guilty of assault or not guilty.' "

No further reference to McDonald's second attack on the instructions is made by the majority except the following comment after the final announcement of reversal because of the omission of the *Lyles* "meaning" instruction: "Since the case will have to be retried, it may be well simply to note two other inadvertences in the court's charge which we are confident will not recur on retrial." The first of these "inadvertences" was thus described: " . . . [F]ollowing a bench conference after the judge had concluded his charge, an additional instruction was given the jury, outlining the alternative possible verdicts, without including not guilty by reason of insanity. . . . "

Thus, the fact that the trial judge, although he instructed the jury carefully, correctly and at considerable length [3] that it might find McDonald not guilty by reason of insanity, did not include that in a list of possible verdicts is described by the majority as an "inadvertence" only; it is not characterized as error, and certainly reversal is not based upon it. Nor could it logically have been. It is elementary that a judge's charge to a jury is to be considered as a whole, and that parts of it are not to be picked out as so deficient as to require reversal when the supposed deficiency is remedied or supplied by another portion of the charge. To me, it is inconceivable that the jury could have been misled into thinking that it could not return a verdict of not guilty by reason of insanity when the judge had so emphatically and at such length, and at more than one place in the charge, instructed it that it might do so.

Moreover, the listing of five possible verdicts in the charge plainly was not intended to exclude the possibility of a verdict of not guilty by reason of insanity. This clearly appears from the

---

3. The portions of the charge having to do with the possible verdict of not guilty by reason of insanity aggregate about five pages of transcript.

judge's language when he first mentioned the five possible verdicts:

"What, then, do these lesser included offenses mean to you as members of this jury? They mean that you have the right to return any one of five possible verdicts in this case. You may find this defendant guilty as indicted, which is guilty of murder in the second degree; or, you may find the defendant guilty of manslaughter; or, you may find the defendant guilty of assault with a dangerous weapon; or, you may find the defendant guilty of assault, or you may find the defendant not guilty."

It will be observed from the foregoing that the judge was discussing and trying to clarify the significance of the term "lesser included offenses." To construe this as excluding a verdict of not guilty by reason of insanity, which he discussed at such length and with such care in other places in the charge, seems to me to be not only illogical but also a decided undervaluation of the intelligence of the average jury.

I note also that McDonald's counsel did not complain that the charge might give the jury the impression that acquittal for insanity was not a possible verdict. At the end of the charge, the judge asked, "Does the defendant request any further charge?", to which his counsel responded, "Yes. We renew our request for the charge on the right to recover stolen property." Thus, he approved of the portion of the charge now criticized by the majority.

Quoted by the majority in this connection is the following statement by the trial judge after a bench conference which followed the conclusion of the charge:

"I am going to repeat something that I said to you earlier and that is that you may return any one of five possible verdicts in this case. Your verdict may be either guilty of second degree murder or guilty of manslaughter or guilty of assault with a dangerous weapon or guilty of assault or not guilty."

As he expressly said, he was repeating an earlier statement which was an explanation of the significance of the term "lesser included offenses." It was not intended to, and I feel sure it did not, expunge from the minds of the jurors the painstaking instruction already given that a verdict of not guilty by reason of insanity might be returned.

The second "inadvertence" in the court's charge is thus described and treated in the majority opinion:

" * * * Also, in its concluding remarks relating to mental responsibility of the accused, the court charged as follows:

" 'If you find that this defendant committed this offense, that is, murder in the second degree or the lesser included offenses and you further find that at the time he committed this offense he was suffering from a mental disease or defect which affected him, that he was incapable of distinguishing right from wrong or if he could tell right from wrong was incapable of controlling his actions, then you would find that the defendant's act was the product of the defendant's mental abnormality.'

"This is not an accurate statement of the *test* for criminal responsibility in this Circuit. We think the jury may be instructed, provided there is testimony on the point, that capacity, or lack thereof, to distinguish right from wrong and ability to refrain from doing a wrong or unlawful act may be considered in determining whether there is a relationship between the mental disease and the act charged. It should be remembered, however, that these considerations are not to be regarded in themselves as independently controlling or alternative tests of mental responsibility in this Circuit. They are factors which a jury may take into account in deciding whether the act charged was a product of mental

disease or mental defect. Wright v. United States, supra, 102 U.S.App. D.C. at 44, 250 F.2d at 12; Misenheimer v. United States, 106 U.S. App.D.C. 220, 271 F.2d 486, certiorari denied, 361 U.S. 971 [80 S.Ct. 603, 4 L.Ed.2d 550]."

The *Wright* opinion is wrong, as I think I demonstrated in dissenting from it. Judges Danaher and Bastian joined in my dissent, and Judge Burger concurred only in the result reached by the majority opinion. I think the *Wright* case should be reexamined and repudiated.

The *Misenheimer* case cited by the majority does not seem to me to support their conclusion. But I must admit that Campbell v. United States,[4] which I think should be overruled as grossly erroneous, does support it. The latter case makes specific a rule which the court had in effect adopted in the *Durham* case and subsequent decisions: that a defendant may be sane to the extent that he is able to distinguish right from wrong and to control his conduct so as to refrain from doing wrong, and yet have some other sort of mental infirmity which excuses him from criminal responsibility. For example, that he is "emotionally unstable;" that, as here, he may be led by a dominant personality; that he is a "sociopath," which really means that he cannot get along with other people.

This rule has been developed over my repeated protests. I renew them here. The *Campbell* case should be overruled and the cases from which it sprang, including Durham v. United States,[5] should also be repudiated or substantially modified. My view is that a person who deliberately chooses to do what he intelligently knows is a criminal act, although he has mental capacity enough to refrain from doing it, should not be excused from criminal responsibility because in some other respects he differs from ordinary men. If a defendant has mental capacity

to understand the criminality of his act and to refrain from doing it, he is sane in the legal sense, even though he may have some eccentricities or limitations of mental ability in other respects which psychiatrists may say amount to a mental disease or defect.

These are my reasons for dissenting from the reversal of McDonald's conviction.

In the main, I agree with Part I of the majority opinion, particularly with that portion which discusses the "some evidence" holding of the *Davis* case.[6] How much evidence is the "some evidence" referred to in that case? Unless and until the Supreme Court changes the *Davis* rule, which I hope it will do, the district and circuit courts will be forced to answer that question. The majority are correct, I think, in saying, "Certainly it [the *Davis* 'some evidence' rule] means more than a scintilla, yet, of course, the amount need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal." But the majority do not go far enough. They should expressly overrule cases such as Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612 (1951); Clark v. United States, 104 U.S.App.D.C. 27, 259 F.2d 184 (1958); and Goforth v. United States, 106 U.S.App.D.C. 111, 269 F.2d 778 (1959), which held the insanity issue was raised by the defendants' self-serving statements which in my view did not constitute even a scintilla of evidence of insanity.

In the *Tatum* case, this court said:[7] "In essence, however, the entire defense [of insanity] rested upon appellant's insistence that he remembered nothing of what happened at the time the offense was committed." Tatum's trial counsel did not request, and the trial court did not give, an instruction on insanity, and the omission was not urged as error on appeal. But this court, acting under the

4. 113 U.S.App.D.C. 260, 307 F.2d 597.

5. 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).

6. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

7. 88 U.S.App.D.C. at 388, 190 F.2d at 614.

"plain error" rule,[8] held the instruction should have been given because the issue was raised by Tatum's statement that he did not remember committing the crime. In its opinion the court said:[9]

" * * * '[I]n criminal cases the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. He is entitled to have such instructions even though the sole testimony in support of the defense is his own.' * * * "

This statement is at variance with the majority's pronouncement in this case— in which I heartily join—that a scintilla is not enough, under which Tatum's conviction could not have been reversed. It is essential, I think, that the *Tatum* case be overruled.

The *Clark* case is of the same type and, pursuant to what the majority now says, should be repudiated. There, this court said: "Defense counsel's attempt to take the defense of insanity out of the case was error."[10] Defense counsel had conceded that his client was guilty of some degree of homicide, although the trial judge told the jury Clark had raised the issue of insanity by merely saying from the stand, "I must have been insane." By holding that in such a setting defense counsel was ineffective because he did not argue the issue of insanity, this court approved the trial judge's ruling that Clark's statement was sufficient to raise the issue. I suggest that the statement was not "some evidence" of insanity and did not amount even to a scintilla. If a defendant may raise the issue of insanity by simply saying, "I must have been insane," the Government must be prepared to meet the issue in every criminal case.

This court's approval of a ruling to that effect should be replaced by disapproval.

The *Goforth* case is equally inconsistent with the majority's holding in the present case as to the "some evidence" rule. As the dissenting judge said:[11]

"There was not one word of testimony from any source to indicate that appellant was suffering from any mental disease or defect. At the most there was only his own testimony, totally uncorroborated, as to imaginings of his intoxicant-befuddled mind—a not unusual phenomenon of continued and continuous drinking, and a far cry from mental disease or defect."

As to Part II of the majority opinion, I thoroughly agree with the majority that

" * * * What psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. * * * "

That is what I meant when I said earlier in this dissent that a person who chooses to do what he knows is a criminal act, when he is mentally able to control his conduct and refrain from doing the criminal act, is sane in the legal sense even though he has some aberration or emotional disturbance which psychiatrists classify as a mental disease or defect. In such a case, the psychiatrically diagnosed "mental disease" could not possibly be the cause of the crime.

It is therefore my conclusion that the judgment of conviction should be upheld and I dissent from its reversal. But, with the limitations indicated, I concur in Parts I and II of the majority opinion, which could largely be retained in an opinion affirming the conviction. In fact,

8. Rule 52(b), Fed.R.Crim.P.

9. 88 U.S.App.D.C. at 391, 190 F.2d at 617, quoting 53 Am.Jr., Trial, § 580, p. 458.

10. I suppose the court meant to say this amounted to ineffective assistance of counsel.

11. 106 U.S.App.D.C. at 113, 269 F.2d at 780.

I think the court should go further than it does in those portions of the majority opinion, and should take the steps advocated by a minority of the court in Blocker v. United States, 110 U.S.App. D.C. 41, at 61, 288 F.2d 853, at 873 (1961). But the court does take two important, much needed and long overdue steps: (a) it says, for the first time, what *we* mean by the term "mental disease or defect" in connection with criminal responsibility; (b) it rules quite clearly that the jury is the sole and final judge of the credibility of all witnesses, including those who testify as experts, and that it is to be so instructed. Heretofore, these two elements have been sadly lacking in this court's opinions.

Taken together, these steps mean that hereafter the jury will know it is not bound by what experts say is a "mental disease or defect" if the abnormal mental condition described by them does not, in the jury's opinion, substantially affect the defendant's capacity to control his conduct in relation to the law. Under this important change, it will be for the jury to decide whether what the experts say in a given case amounts to a mental abnormality which substantially affects the defendant's capacity to control his conduct and conform to the law. These two steps have long been urged. *E.g.,* see the dissenting opinions in Blocker v. United States, supra, and Campbell v. United States, 113 U.S.App.D.C. 260, 307 F.2d 597.

The rulings to which I refer have become especially necessary because of the frequent alteration and expansion of the definition of "mental disease" by those experts who appear most frequently as witnesses in this jurisdiction. They suddenly reclassified psychopathic (sociopathic) personality as a mental disease in In re Rosenfield, 157 F.Supp. 18 (D.D.C. 1957); they reclassified emotionally unstable personality as a mental disease in Campbell v. United States, supra; they reclassified narcotics addiction as a mental disease in United States v. Carroll, Criminal No. 383–62 (D.D.C. June 28, 1962) and United States v. Horton, Criminal No. 59–62 (D.D.C. July 12, 1962). I think it obvious that the new classifications were made by the doctors for clinical purposes only, for demonstration is not needed to make it plain that these conditions newly called "mental diseases" are not such in the legal sense. Until now, this court has allowed the shifting wind of expert nomenclature to control its decisions.

In United States v. Spaulding, 293 U. S. 498 at page 506, 55 S.Ct. 273, at page 276, 79 L.Ed. 617 (1935), the Supreme Court said:

"The medical opinions that respondent became totally and permanently disabled before his policy lapsed are without weight. * * * [T]hat question is not to be resolved by opinion evidence. It was the ultimate issue to be decided by the jury upon all the evidence in obedience to the judge's instructions as to the meaning of the crucial phrase, and other questions of law. The experts ought not to have been asked or allowed to state their conclusions on the whole case. * * * "

I think it follows from the foregoing that psychiatrists may not testify as to their conclusions as to the ultimate questions of insanity and causality which must be decided by the jury. Any lawyer or judge with trial experience will know how an expert witness can be properly questioned to elicit admissible information which will help the jury in reaching its decision, without asking him for his conclusion on the ultimate jury question.

The majority have made a worthwhile effort to clarify the confusion engendered in the minds of trial judges by the *Durham* case and subsequent decisions. The effort may succeed if the present majority opinion is not whittled away by this court in future cases.